UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                              Case No. 2:25-cr-20757
        v.                                  Hon. Matthew F. Leitman

JOSHUA STILMAN,

               Defendant.

_____/

## **UNITED STATES' SENTENCING MEMORANDUM**

Joshua Stilman used artificial intelligence (AI) to create sexually explicit images of multiple women and used those images to threaten, extort, or embarrass at least two of his victims. This Court will see more prosecutions involving the use of AI for blackmail and sextortion in the future. The question is, what is the appropriate sentence? Victim-1 thinks Stilman deserves the five-year statutory maximum for cyberstalking. The concept of general deterrence, alone, suggests that this type of crime cannot be ignored with a slap on the wrist, no matter the history and characteristics of the individual defendant. This is a 21st century prosecution that deserves a 21st century sentence. With a guideline range of 18 to 24 months, and in light of the Rule 11 plea agreement that caps the government's recommendation at the top of the guidelines, the government recommends a top-of-the-guidelines sentence as "sufficient, but not greater than necessary, to comply

1

with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008).

## I. Background

### Stilman's cyberstalking campaign against Victim-1

Victim-1 was a social media influencer with approximately 100,000 followers. She is also a mother of three kids. She had spent over a decade building an online business, specializing in photographing women, which was at its most profitable in 2021. That is the year that Stilman first contacted Victim-1 via direct message. (Ex. 1, Victim-1 Impact Statement, p. 1).

From at least 2021 through March 2025, Stilman engaged in an aggressive online campaign against Victim-1. As an avid follower of Victim-1's online content, Stilman knew that the threat to release nude images to her thousands of followers could embarrass her or harm her reputation.

In October 2021, Stilman direct-messaged Victim-1 to suggest that she should start an "OnlyFans" (a website intended for live-streaming pornographic content) while simultaneously touting his respect for women:



In February 2022, Stilman sent Victim-1 an e-mail with the subject line, "Dearest [Victim-1], the Milf photographer." (Ex. 1, p. 1). Using a different account ("friendblender"), from February through March 2024, Stilman sent Victim-1 five AI-generated images of herself, accompanied by direct messages.

Victim-1 is depicted as being nude in all of the images, and her legs are spread open in two of them. Stilman also suggested to Victim-1 for the second time that she should start an OnlyFans and split the profits with him:



In December 2024, Stilman sent Victim-1 a text message and a publicly-available image of herself, and commented on Victim-1's breasts and tattoos. At one point, Stilman also sent Victim-1 a hand-written list of disturbing ideas for more AI-generated content, which he apparently brainstormed into a notebook, with the caption "[Victim-1] Memes:"

4



On March 4, 2025, Stilman sent more text messages to Victim-1, including "Btw do you like this one with the cum on your face?" and "I don't know if it's flattering to hear, but I have jacked off to you so many times[.]" The messages were accompanied by two AI-generated images of Victim-1, including one of her face with a white substance on it with the caption, "I will drain your balls," and another AI-generated image of Victim-1 topless.

Between March 4 and March 5, 2025, Stilman sent Victim-1 six additional

AI-generated images of herself, including images of Victim-1 nude and engaged in sex acts. A search warrant to Instagram produced the following AI-generated images in the conversation between Victim-1 and Stilman:

- One image shows Victim-1 being anally penetrated by an unknown male.

- Two images show Victim-1 fully nude posing with her rear end towards the camera.

- A third image shows Victim-1 nude while hugging an oversized penis.

- A fourth image shows Victim-1 on her back being penetrated by a penis from the male's point-of-view.

- A fifth image shows Victim-1 posing in workout clothes, with the clothing around her breast and pubic area cut-away so that those areas are fully exposed.

On March 5, 2025, the defendant sent the following direct messages to Victim-1:

- "You look so hot here"

- "Good morning :) I hope you're still into talking to me like you were yesterday [shoulder shrugging emoji] What's your fav sex position? I want to know how I should imagine you"

- "I get that morning are busy. Just respond when you can :)"

- "I would never share this convo with anyone. Just you and me. Like the

photos."

- "I hope I didn't offend you…"

- "Can I assume you like doggy?"

- "Was hoping you'd be more responsive than this?"

- "I wish you'd respond to some of my questions. I really don't want to resort to posting things online. I have much more than you've seen. I'm really not trying to offend you either. I jack off to you every day, I just want to know what you like. I'm not going to expect you to talk to me everyday or even that often. But I want to know some naughty things about you."

Victim-1 responded, "don't threaten me." Stilman replied, "Can you play along though? Easiest way to get rid of me lol."

On March 6, 2025, Stilman sent Victim-1 a link to a Google photo album containing approximately 20 pornographic AI-generated images of Victim-1. The album was accompanied by the following messages:



Victim-1 was able to identify the owner of the Google account as "Josh Stilman."

After some internet sleuthing, Victim-1 found Stilman's LinkedIn page and other

social media and determined he was married. Victim-1 asked Stilman, "Does your

wife know you're messaging me?" Stilman then immediately blocked Victim-1 on

Instagram, made his LinkedIn account private, and deleted the Google photo

album.

The FBI obtained a search warrant for Stilman's Google account, and it

appears Stilman deleted the Google album. However, Victim-1 recorded a short

video of the contents of the album before it was deleted, and it contained many of

the same images the FBI independently located on Stilman's Instagram account.

8

<u>Other victims contact Victim-1</u>

For sake of clarity, there are at least four identifiable women who have been victimized in varying degrees by Stilman: Victim-1, Victim-2, Victim-3, and Stilman's ex-wife.

Victim-1 began trying to gather as much information about Stilman as possible and compiled a timeline of Stilman's attempts to contact her over the years. (Ex. 2, Victim-1 Timeline). In March 2025, Victim-1 was able to get in contact with Stilman's ex-wife on Facebook. Stilman's ex-wife shared that Stilman had engaged in similar behavior when they were married, which was part of the reason for their divorce. (*Id.* at p. 2). She explained to Victim-1 that, while getting divorced, she found pornographic photos that fixated on Victim-3, whom Stilman knew from high school:



This is part of his album I found when I filed for divorce.

Victim-3 was the [redacted] he was in called [redacted] who was married to a person in [redacted] that Josh went to high school with. I would say about 75% of his fantasies that I found in the pictures were of her.

She also told Victim-1 about Victim-2, whose story is explained below. Stilman's ex-wife's claims were corroborated in multiple ways.

First, Victim-1 spoke to Victim-2. Victim-2 explained that years ago, Stilman had drugged her, had sex with her, recorded it, and posted the video to a pornographic website. Victim-2 also explained that Stilman made a meme of her giving Stilman oral sex, similar to the memes Stilman created of Victim-1:

He made a meme of me giving him head

I was so creeped out...like why?

I've went to the cops over him to. He posted a video of me on a porn site once but nothing ended up happening with the case

The FBI was able to locate a police report from June 2020 where Victim-2 reported her rape. (Ex. 3, RPD Report 20-0005649). The case was not presented to a prosecutor due to Victim-2's decision to stop cooperating with police. (*Id.* at STILMAN_00161). The police investigation included text messages that Stilman sent to Victim-2, admitting that he had posted a pornographic video of Victim-2 online without her consent:

11



## II.   Guidelines Calculation

The PSR finds and the government agrees that the guideline range is 18 to 24 months. While the guidelines are advisory, the Court must begin its sentencing analysis by calculating the correct range. *See United States v. Booker*, 543 U.S. 220, 245 (2005).

## III.   Sentencing Factors

Congress has provided various factors for courts to consider when imposing

a sentence in 18 U.S.C. § 3553(a). The most relevant factors for this defendant are addressed below.

a.  <u>Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)</u>

Stilman watched Victim-1 from behind his computer screen for *years*, contacting her occasionally through social media in messages that became progressively more aggressive. He eventually decided to download publicly-available pictures of Victim-1, used AI to turn those pictures into gross sexual memes, and threatened Victim-1 with the release of the fake pictures if she did not respond to Stilman's direct messages in a way that emotionally and sexually satisfied him.

The government cannot emphasize enough that no one deserves to have AI used against them in this way. Victim-1 was not "asking for it" by developing a social media following and posting some personal content online, or by specializing in boudoir photography. The same is true for parents who post images of their children on social media; they don't deserve to have predators use those images to create child pornography simply for participating in modern life on the internet. It was Stilman's choice, and Stilman's choice alone, to not only morph those images in the way he did, but to then use them against Victim-1 for further sexual gratification. Keeping the images to himself was not enough.

A top of the guidelines sentence will adequately account for the nature,

13

circumstances, and seriousness of the offense.

   b.   History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

If Stilman's conduct against Victim-1 was a one-time thing, maybe he would deserve a more lenient sentence. But Stilman has a long history of creating internet memes of other women, including of Victim-2, who credibly accused Stilman of raping her, recording it, and posting the video online. And even if the government is not aware of evidence that Stilman posted, or threatened to post, the memes and nude images he created of Victim-3 and his ex-wife, the allegations alone show that Stilman's conduct with Victim-1 was part of a broader pattern. Even Stilman admitted that he used his education and training in graphic design to create "fake pornographic images of celebrities and people in his life who he found attractive" because "he enjoyed" it. (PSR ¶ 60). Stilman has a serious problem that results in him fixating on a specific woman, which has on at least two occasions resulted in real-world consequences, and which he needs mental health treatment for.

Stilman will undoubtedly ask for leniency, or perhaps even a probationary sentence, due to his cancer treatment. But BOP routinely treats inmates with cancer and the government has no objection to a recommendation that Stilman be designated to a Federal Medical Center. In fact, while BOP medical care levels range from Level 1 (being the lowest-risk medical patients) to Level 4 (being the highest-risk), inmates with various stages of cancer can be managed at a variety of

prisons ranging between Medical Care Level 2 through 4. (Ex. 4, BOP Clinical Practice Guidelines, pp. 6-7). Stilman will also benefit from psychological treatment in BOP custody; despite all of the government's faults and legitimate criticisms one could have of the criminal justice system, BOP has some of the best practitioners of correctional psychology in the country, if not the world.

    c.  <u>Seriousness of the Offense, Just Punishment, Respect for Law, Adequate Deterrence and Protecting the Public, 18 U.S.C. § 3553(a)(2)(A)-(C)</u>

It is worth noting that Victim-1 is not asking for restitution. What she is asking for is the statutory maximum five years in prison, and that Stilman be required to register as a sex offender. The government on the other hand is bound by the terms of the Rule 11 plea agreement, which caps the government's recommendation at the top-of-the-guidelines.[1] Whether or not this Court views Victim-1's request as realistic, what the Court should not ignore is that Victim-1 is

---

[1] The government defers to the Court on whether Stilman should be required to register as a sex offender. In *United States v. Lloyd*, 809 F. App'x 750, 753 (11th Cir. 2020), the panel found that cyberstalking a minor victim required sex offender registration. However, the Sex Offender Registration and Notification Act's definition of a sex offense explicitly includes (i) a criminal offense that has an element involving a sexual act or sexual contact with another; and/or (ii) <u>a criminal offense that is a specified offense against a minor</u>, among other enumerated definitions not applicable here. *Id.*; 34 U.S.C. § 20911(5)(A)(i)-(v). In contrast to *Lloyd*, this case does not involve an offense against a minor. For purposes of this sentencing, the government takes no position on whether cyberstalking is "a criminal offense that has an element involving a sexual act or sexual contact with another."

asking for a significant sentence not just on her own behalf, but on behalf of the unknown number of other women Stilman victimized privately and publicly.

One of the most significant factors this Court should consider in fashioning an appropriate sentence is deterrence, both specific and general. As to specific deterrence, a non-custodial sentence for Stilman would not be enough to ensure that he is not tempted to treat women in the same way again in the future. The public shame he has had to live through as the result of being charged with a felony, and the inconvenience of being on Court supervision, is not enough. Only a custodial sentence will signal to Stilman that his conduct is not acceptable in modern society.

As for general deterrence, as noted at the top of this brief, this Court will undoubtedly see more cases involving nefarious uses of AI and the internet to stalk, extort, and blackmail others, but especially women. What signal would it send to other online predators if a man who drugged and raped a woman and admitted to posting the video online, and who tried to extort another with AI porn, receives a probationary sentence? It would signal to some that the payoff is worth the risk. A custodial sentence would be just punishment, promote respect for the law, and would deter Stilman and others like him from committing similar future crimes.

16

## V.    Conclusion

The government recommends a top of the guidelines sentence.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

*s/Zachary A. Zurek*
Zachary A. Zurek
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0285
Zachary.zurek2@usdoj.gov

Dated: May 14, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, the foregoing document was electronically filed with the Clerk of the Court of the Eastern District of Michigan using the ECF system.

*s/Zachary A. Zurek*
Zachary A. Zurek
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-0285
Zachary.zurek2@usdoj.gov

18