UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA STILMAN,<br><br>Defendant. | Case No. 25-cr-20757 (MFL)(APP)<br><br>Hon. Matthew F. Leitman |

## **DEFENDANT JOSHUA STILMAN'S SENTENCING MEMORANDUM**

This Court should punish Josh, but it should do so in a way that allows him to fight for his life outside prison with his current medical team.  Accordingly, Josh asks for a sentence of home confinement with conditions that impose meaningful punishment, but also includes mental health treatment/therapy and the ability to receive necessary medical treatment to address his cancer.  Such a sentence would also be appropriate due to Josh's diagnosed and preexisting mental illness.

### **Background**

"Between 2020 and 2023, the defendant's mental health significantly declined[,] leading to severe depression and suicidal ideation."  (PSR ¶ 58.)  During that time, Josh was hospitalized on multiple occasions and engaged in inpatient treatment for mental illness.  (Id.)

On and around March 4 and 5, 2025, Stilman engaged in unconscionable conduct designed to harass, intimidate, and scare the victim in this case.

In April 2025, Stilman "was diagnosed with an aggressive form of testicular cancer." (PSR ¶ 54.)  He underwent two surgeries and was deemed cancer free.

In February 2026, the cancer returned (a tissue mass was found in Josh's abdomen as well as enlarged lymph nodes in the region) and, as a result, Josh commenced four rounds of chemotherapy that have recently concluded.

Josh had a CAT scan on May 11, 2026 following completion of the last round of chemotherapy.  The scan showed that the mass and lymph nodes decreased in size, indicating that Josh has responded to the chemotherapy.

There is an appointment with the oncology team on May 19, 2026 to determine the treatment plan going forward.  At this point, Josh's options seem to be an additional round of chemotherapy, close surveillance, or surgery to remove the mass and enlarged lymph nodes. The oncologist has not suggested a recommended course of action to date.

### Sentencing factors and purpose

This Court must "impose a sentence sufficient, but not greater than necessary, to" achieve the purposes of a sentence set forth by Congress.  18 U.S.C. § 3553(a).  These purposes are to (i) provide just punishment that reflects the seriousness of the offense and promotes respect for the law, (ii) deter criminal

conduct, (iii) protect the public from the defendant, and (iv) provide the defendant appropriate medical care and rehabilitative treatment. 18 U.S.C. § 3553(a)(2).

And there are factors this Court must consider in fashioning a sentence no greater than necessary to achieve these goals. These factors are (i) the sentencing guideline range and applicable Sentencing Commission policy statements, (ii) the nature and circumstances of the offense, (iii) the history and characteristics of the defendant, (iv) the need to avoid sentence disparities, and (v) the need to obtain restitution for crime victims. 18 U.S.C. § 3553(a)(1), (3)–(7).

### Sentencing guideline calculation

While the guideline range calculation is the starting point, *Gall v. United States*, 552 U.S. 38, 49 (2007), it is only a factor in sentencing, *id.* at 49–50. The guidelines must be correctly calculated, but in doing so, this Court "may not presume that the Guidelines range is reasonable." *Id.* 50. Indeed, there must be "an individualized assessment based on the facts presented." *Id.*

There is no dispute concerning the total offense level calculation of 15. Josh has no criminal history. The resulting guidelines are 18 to 24 months.

### Argument

Josh's criminal conduct is not excusable. He should be punished. In fact, Josh has a right to be punished so he can be made whole (just as society has a right to seek "just deserts").

3

But the choice of what punishment to impose demands consideration of the fact that Josh is fighting for his life from an aggressive form of testicular cancer, which has already spread twice.  The choice of punishment also demands consideration of Josh's mental illness.

Undersigned counsel submits it would be unduly severe to incarcerate a man (husband and father) to prison, who has undergone at least two surgeries, just completed four rounds of chemotherapy, requires close monitoring, and may require additional surgery and/or chemotherapy.  Indeed, Josh's doctors have yet to fully assess his current condition and make a recommendation concerning future treatment.

The choice of punishment should also consider Josh's mental illness and its possible impact on his criminal conduct.  Although the guideline range calls for a sentence of imprisonment, it would be appropriate, reasonable, and just to fashion a punishment that enables Josh to remain home, with access to his current medical care.  Indeed, the sentencing factors require both varying and departing downward from such range because of (i) Josh's mental illness, and (ii) Josh's physical condition.

**A.      The sentencing factors support a noncustodial sentence**

     1.      <u>Offense nature and circumstances</u>

The nature and circumstances of the offense are serious.  While there is no justification for this offense, the facts and circumstances surrounding the event suggest Josh's mental health may have been a contributing factor.

     2.      <u>Characteristics of the defendant</u>

The characteristics of this defendant support a noncustodial sentence.

Josh is 37 years old.  He is "an extraordinarily talented and creative person." (A. Fragatos Ltr., at 1.)[1]  He is "sensitive, intelligent, witty, compassionate, and deeply emotionally aware."  (Id.)

     a.  <u>Childhood</u>

Josh was born in 1989 in Clawson, Michigan.  He was raised in both Clawson and Farmington Hills.  (PSR ¶ 52.)  His father (Jeff) is an engineer and an attorney, who worked for Chrysler (now Stellantis).  (PSR ¶ 47.) His mother (Erin), who is now disabled, was a court reporter.  Josh grew up with a sister, who is about three years younger than he.  (PSR ¶ 49.)  Josh's childhood was "very good," as he was raised by loving, involved and caring parents.  (Id.)

---

[1]      Character witness letters to Judge Leitman are being submitted to Chambers, along with a courtesy copy of this Memorandum.  Please note that the character witness letters have not been filed.

Josh graduated from North Farmington High School in 2007 and enrolled in Michigan State University. (PSR ¶ 67.) But Josh struggled at MSU and left school during his sophomore year. (A. Fragatos Ltr., at 2.) Josh joined a band and started pursuing a music career. (Id.)

  b. Adult life

While Josh was progressing with his band, his girlfriend (Jessica) got pregnant. (Id.) After learning of Jessica's pregnancy, "Josh became deeply committed to being the best father he could be." (Id., at 1.) Josh and Jessica would eventually marry. Cambria was born in 2015 (she is 11 years old now).

Josh "worked tirelessly to support his family . . . [,] as an assistant manager at Jimmy John's" while attending Lansing Community College to try to regain admission to MSU. (Id.) He was successful, obtained his master's degree in interactive design, and worked as a teacher's assistant at MSU. (Id.) Josh accomplished this while caring for Cambria, as well as Jessica (during her two cancer diagnoses and treatments). (Id., at 2.)

Sadly, Josh and Jessica divorced. The divorce "devastated" Josh. (Id., at 1.) Joint custody was awarded. After the divorce, Josh moved back in with his parents in Farmington Hills and Jessica remained in Lansing. "For three years, Josh drove from Farmington Hills to Lansing every Friday to pick Cambria up from school, and drove her back to Lansing every Monday morning. He structured his entire

6

life around the time he was able to spend with her." (Id., at 3.)

c. Mental health

In 2020, after the divorce and a significant medical event that left his mother mentally disabled (and essentially a severe dementia patient), Josh's "mental health significantly declined[,] leading to severe depression and suicidal ideation." (PSR ¶ 58.)

Josh was hospitalized for his mental illness at least three times. This included a formal diagnosis of Major Depressive Disorder and inpatient treatment at Harbor Oaks Hospital and Henry Ford Kingswood. (PSR ¶ 59.)

During one of the hospitalizations, Cambria's mother, Jessica, obtained full temporary custody of Cambria. This exacerbated Josh's mental condition. Months of court proceedings later, the original custody arrangement was reimplemented.

d. Cancer diagnosis and treatment

Josh was diagnosed with an aggressive form of testicular cancer in April 2025. He underwent two surgeries that included the removal of one testicle and 54 lymph nodes from his stomach and surrounding areas. The surgery had profound physical effects on Josh. In August 2025, Josh was deemed cancer free and was closely monitored with regular blood testing and CAT scans. (PSR ¶ 54.)

In February 2026, a soft tissue mass was found in Josh's abdomen along with enlarged lymph nodes—Josh was diagnosed with testicular cancer that had

metastasized to the lymph nodes.  (PSR ¶ 55.)  In March 2026, Josh started an approximately 80-day chemotherapy regimen.  (PSR ¶ 55.)

Josh has now completed the chemotherapy.  He received a CAT scan on May 11.  On May 19, Josh is scheduled to meet with his oncology team to review the results and, based on the results, devise an oncology treatment plan.  At this time, such a plan could include more chemotherapy, close surveillance, or surgery.  Currently, Josh has a port in his body to deliver chemotherapy, which has to be cleaned out every six weeks.  The doctors have left the port in place in case they decide to give Josh another round of chemotherapy.

        d.     <u>Family life</u>

"Even at his lowest point of depression, Joshua was able to rise above his condition to be the ideal father."  (J. Stilman Ltr., at 1.)  He is always there for her. (Id.)  "Cambria adores her father.  Their relationship is honest, joyful, affectionate, and deeply connected."   (A. Fragatos at 4.)

"Josh is a remarkable father."  (Id.)  He is actively involved in Cambria's life and makes a concerted effort to put her first.  (J. Stilman Ltr., at 1.)  They make home movies (the "Dad & Cam Show"), go on nature walks, and study together. (A. Fragatos at 4.)  Josh volunteered to lead a math club after school to be able to spend more time with Cambria and her friends and help the children learn math. (Id.) Josh is a regular attendee at parent-teacher conferences and extracurricular

activities.  (Id.)  Eventually, Josh used his master's degree to start substitute teaching so that his work hours would not limit his time with Cambria.

Josh also provides significant assistance to his father, the caregiver for Josh's mom, who is unable to care for herself.  The loss of Josh's assistance "would be deeply felt."  (J. Stilman, at 1.)

Josh willingly helps others as well.  He regularly helps care for his in-laws, who face medical issues and live in Cleveland.  (A. Fragatos Ltr., at 6; P. Fragatos Ltr., at 2.)  Josh does what he can to help family and friends.  It has not gone unnoticed.

Nor should it go unnoticed that, in the face of Josh's criminal conduct, Josh's wife, father-in-law, and other family members have decided to support, rather than abandon, him.  (See generally Character Letters submitted to Chambers.)  This is evidence of Josh's underlying character, his goodness, and his capacity for rehabilitation.

3.    Restitution and sentencing disparities

As noted by the Probation Department, restitution is not applicable here.  In addition, there can be no sentencing disparities within this one-defendant case. Although the Probation Department identifies national sentencing statistics (PSR ¶ 100), there is no requirement this Court consider them.  *United States v. Hymes*, 19

F.4th 928, 935–36 (6th Cir. 2021).  Indeed, it is the calculation of the guidelines and weighing departures and variances, which avoids sentencing disparities.  *Id.*

In any event, this case will not cause sentencing disparities among similarly situated defendants.  Josh's medical condition and preexisting mental illness make him uniquely situated.

       4.      <u>Mental health supports both downward departure and downward variance.</u>

This Court should depart and vary downward from the guidelines due to Josh's mental illness, which was diagnosed prior to his criminal conduct.

<u>Downward departure</u>.  USSG § 5K2.13 provides a departure may be warranted if (i) the defendant committed the offense while suffering from a significantly reduced mental capacity, and (ii) the significantly reduced mental capacity contributed substantially to the commission of the offense.  The Sixth Circuit affirmed a § 5K2.13 downward departure in *United States v. Cockett*, where the defendant suffered from a depressive disorder and a thinking disorder that impaired her ability to exercise the power of reason during the period she committed tax fraud.  330 F.3d 706, 711–16 (6th Cir. 2003) (holding that "impairment does not mean total absence of reason" and a defendant can volitionally commit an offense while still qualifying for the departure).  Importantly, a § 5K2.13 departure does not require a direct causal link between the reduced mental capacity and the specific crime charged; it is sufficient that the

10

reduced capacity contributed substantially to the commission of the offense.  *Id*. at 713 (citing *U.S. v. Sadolsky*, 234 F.3d 938, 942–43 (6th Cir. 2000).  However, the condition must be sufficiently "unusual" to make the case atypical.  *Id*., at 714–15 (quoting *Koon v. U.S.*, 518 U.S. 81, 98 (1996); *see also U.S. v. Borden*, 365 Fed. App'x 617, 620 (2010) (depression in conjunction with personality disorder supported departure).

Downward variance.  Even where a formal guidelines departure is denied or unavailable, the district court may impose a below-guidelines sentence as a variance based on the § 3553(a)(1) factor requiring consideration of "the history and characteristics of the defendant." 18 U.S.C. §  3553.  District courts must meaningfully consider mental health evidence presented at sentencing.  Indeed, a sentence is procedurally unreasonable if the court ignores a defendant's mental health diagnoses.  *United States v. VanderMolen*, 2024 WL 1435206, at *3 (6 Cir. Apr. 3, 2024) (unpublished).  While the court in *VanderMolen* ultimately affirmed the within-guidelines sentence, it did so because the district court had expressly engaged with the psychiatric evidence and explained why it was insufficient to justify a departure or variance—implicitly recognizing the relevancy of mental health to the § 3553(a) analysis.  *Id.*, at *4.

Josh's mental health is not typical.  He has a formal diagnosis of Major Depressive Disorder years before this offense conduct, and the condition has led

11

him to be hospitalized on at least three occasions and temporarily lose custody of his child.  Josh was dealing with this mental illness and operating with a diminished capacity at the time he voluntarily made the terrible, harmful decisions that bring him before this Court.

> 5.      Josh's physical condition is a basis for downward variance.

The previous guideline provision allowing departure for medical conditions (U.S.S.G. § 5H1.4) has been removed.  But Josh can and does seek a downward variance based on physical condition under the § 3553(a) factors—specifically, the § 3553(a)(2)(D) factor concerning the need to provide the defendant with needed medical care in the most effective manner.

In *United States v. Karr*, the court denied the defense's motion for a downward departure under § 5H1.4 based on the defendant's lung cancer diagnosis, but nonetheless imposed a below-Guidelines sentence of 108 months as a variance. 611 F.Supp.3d 395, 398–99 (2020) (recognizing the "concerning prognosis" was a proper consideration).  (It should be noted that, due to the recent removal of § 5H1.4, there is a dearth of caselaw addressing variance in the medical context.)

And even if this Court were to evaluate this under the rubric of former U.S.S.G. § 5H1.4, a reasonable departure is warranted.  *United States v. Sabino*, 274 F.3d 1053, 1078 (6th Cir. 2001), *opinion amended and superseded on other grounds*, 307 F.3d 446 (6th Cir. 2002) (affirming three-level downward departure

to sentence of probation due to defendant's eye and ear conditions, in combination with other factors); *United States v. McClean*, 822 F. Supp. 961, 962 (E.D.N.Y. 1993) (downward departure "required on the grounds of th[e] defendant's poor health and vulnerability," particularly "[i]n view of the apparent reluctance of the warden to adequately address his disability problems"); *see also United States v. Tocco*, 200 F.3d 401, 435 (6th Cir. 2000) (instructing the district court to consider the extent of the defendant's infirmities and the prison system's ability or inability to accommodate them); *United States v. Willis*, 322 F. Supp. 2d 76, 84 (D. Mass. 2004) (courts "must look to the BOP's ability to handle an offenders' [sic] situation" in determining appropriate sentence).

There is a real risk in this case that, if Josh's cancer is not actively and properly cared for, Josh's life will be shortened.

**B.    The goals of sentencing are furthered by a noncustodial sentence**

A noncustodial sentence is appropriate because it is sufficient to accomplish sentencing goals in this case. Such a sentence would (i) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (ii) deter Josh and others from committing this offense in the future, (iii) adequately protect the public from Josh, (iv) recognize Josh's struggle with mental illness, and (v) allow for proper medical care and accommodate any rehabilitative needs. 18 U.S.C. § 3553.

1. <u>Reflect seriousness of offense, promote respect for law, and provide punishment</u>

A noncustodial sentence here would still "reflect the seriousness of the offense . . . promote respect for the law, and . . . provide just punishment for the offense." (See PSR ¶ 95.)

The offense was serious and should be punished.

While a custodial sentence promotes respect for the law, so does a public felony conviction. Law enforcement's reaction to Josh's online conduct, the raid on his home, the publicity this case has received (and the shame associated with the publicity), will promote sufficient respect for the law.

In terms of just punishment, this Court should consider the precarious nature of Josh's medical condition and mental health. The psychological effects, including anxiety and fear, of sending someone with a cancer diagnosis into the prison system to receive treatment could be severe. This would be a particularly cruel form of punishment with reasonably foreseeable anxiety and fear not only plaguing Josh, but also those who love him. (Indeed, both of Cambria's parents have been diagnosed with cancer now.)

2. <u>Deterrence</u>

There are two species of deterrence—specific and general. With respect to specific deterrence, for the reasons stated above concerning recidivism, Josh has accepted responsibility for his actions and their consequences. Undersigned

14

counsel respectfully suggests that living with the possibility of going to jail since indictment, together with the strain Josh has caused his family as a result of his conduct, is sufficient to deter Josh from engaging in illegal conduct in the future.

It seems reasonable to conclude that the result of Josh's conduct—the raid, children being present during the raid, and a felony conviction—will deter the public at large from making Josh's mistake in the future.  While a sentence of imprisonment could theoretically lead to general deterrence, a federal felony conviction of this nature (without more) is enough to deter others.

It should also be noted that, before any charges were brought against Josh, he voluntarily started therapy and sex addiction classes.  (A Fragatos Ltr., at 5.)

3.    <u>Protection of the public</u>

While a sentence of incarceration would theoretically protect the public from Josh, conditions of release limiting Josh's access to social media will have the same effect in this case.  There is no evidence in this case that Josh was close to leaving a computer screen.  The public and victim in this case will be protected (as they are now) by Josh's current release conditions.

4.    <u>Correctional treatment and care</u>

As noted above, Josh has significant medical conditions that will require treatment if incarcerated.  This is a valid reason for variance.

In addition to treatment for cancer, Josh would benefit from continued treatment and therapy to deal with Major Depressive Disorder.

## Conclusion

Josh should be punished, but not sent to prison.  Because of Josh's cancer and need for medical treatment, this Court should impose home confinement, social media restrictions, ongoing mental health treatment and other conditions necessary to punish.  Failing to recognize the punishment fate exerted in this case would be less than just.

Date: May 14, 2026

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford (P82903)
Patrick Hurford PLLC
500 Griswold St. (Suite 2400)
Detroit, MI 48226
Tel: 313-367-1200
E-mail: patrick@hurford.law

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will send

notification of such filing to all counsel of record.

Respectfully submitted,

/s/ Patrick J. Hurford
Patrick J. Hurford (P82903)
Patrick Hurford PLLC
500 Griswold St. (Suite 2400)
Detroit, MI 48226
Tel: 313-367-1200
E-mail: patrick@hurford.law